IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JESSE DALLMAN,

                Plaintiff,                    OPINION & ORDER

   v.

                                                 12-cv-765-wmc

FELT & LUKES, LLC, PARKER
COMMUNITY CREDIT UNION, and
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA,

                Defendants.

---

      In this civil action, plaintiff Jesse Dallman contends that defendants Parker Community Credit Union ("PCCU") and Felt & Lukes, LLC ("Felt & Lukes") unlawfully seized his Ford F350 after he defaulted on his loan payments in violation of the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, the Wisconsin Consumer Act ("WCA"), Wis. Stat. § 421 *et seq.*, and other Wisconsin statutes and common law.[1] Dallman admits defaulting on the loan, but he contends that the repossession was unlawful because defendants failed to provide him with proper notice, as required by the WCA, before repossessing the F350. Before the court now is defendants' motion for summary judgment (dkt. #18). Because the court finds that the WCA did not apply to the transaction in question and because Dallman has advanced no other reason why the repossession was unlawful, it will grant defendants' motion.

---

[1] Travelers Casualty and Surety Company of America ("Travelers") is allegedly Felt & Lukes' insurer. (*See* Amended Compl. (dkt. #12) ¶ 8.)

UNDISPUTED FACTS[2]

Plaintiff Dallman, a resident of Afton, Wisconsin, was a member of PCCU and had been for several years. PCCU, a federally-insured and state-chartered credit union, with its primary place of business in Janesville, Wisconsin, is in the business of extending credit to individuals. Felt & Lukes, LLC is a Wisconsin limited liability corporation with its primary place of business in Hartland, Wisconsin. While the exact nature of Felt & Lukes' business is disputed, the parties agree that it collects debts for third parties, in the course of which it recovers assets, makes phone calls, sends letters, works with attorneys, reviews bankruptcies and files claims.

On December 6, 2004, Dallman became a participant in PCCU's Loanliner Plan (the "Plan"), an open-end, multi-featured credit plan which by its terms required him to complete only one security agreement at the time of his enrollment. Upon completion, participants could then apply for and obtain multiple loans, called "advances," without having to sign a new security agreement each time. Thus, all loans obtained through the Plan were subject to the terms of the original security agreement. Finance charges differed between loans, and payments were applied to the specific loan for which they were intended (as reflected on transaction receipts).

Dallman completed the Loanliner Security Agreement (the "Security Agreement") with PCCU on December 6, 2004. The Security Agreement contains a cross-collateralization provision for all loans issued under it, meaning that the collateral put forth for each individual loan would also serve as collateral for all other loans made under the

---

[2] The following undisputed facts are derived from the parties' submissions on summary judgment when viewed in a light most favorable to Dallman as the non-moving party.

Plan, both past and future.[3] The Agreement also references several specific provisions of the Wisconsin Consumer Act ("WCA") and contains no provision excluding any transactions made pursuant to the agreement from the WCA.

As to actions after default for Wisconsin borrowers, the Agreement advises:

> When you are in default and after expiration of any right you have under the applicable state law to cure your default, we may require immediate payment of your outstanding loan balance under the Plan and seek possession of property given as security. You may voluntarily give the property to us if you choose, or we may seek to take possession of the property by judicial process. If we repossess the property, you agree to pay reasonable expenses incurred in the disposing of the property. If the property is a motor vehicle, mobile home, trailer, snowmobile, boat or aircraft, you will also be required to pay any costs permitted by Section 422.423 of the Wisconsin Statutes.

On January 11, 2011, Dallman obtained two loans through the Plan. In the first loan ("Advance E"), Dallman borrowed $40,561.50 in order to refinance a 2003 Ford F250 Super Duty XL, purchased in 2007 (the "F250"), which was valued at $35,000. Advance E was secured by the F250 and all property securing other advances as set forth in the Security Agreement's cross-collateralization provision. Advance E had an APR of 8.5% and a monthly payment of $756.33. The due date for the first payment on Advance E was February 26, 2011, forty-five days after it was disbursed.

In the second loan ("Advance F"), Dallman borrowed $14,472.32 to finance a 2003 Ford F350 Super Duty Crew Cab Laria (the "F350"), which was valued at $18,350. That loan was secured by the F350, as well as all other property securing other advances. Advance F had an APR of 8.0% and a monthly payment of $353.34. The due date for

---

[3] Specifically, the Security Agreement states that: "Property you give as security will secure all amounts owed under the Plan and all other loans you have with us now or in the future, except any loan secured by your principal dwelling."

Dallman's first payment on Advance F was February 11, 2011, thirty days after he obtained it.

Under the Security Agreement, a borrower defaults when he fails to make a payment when due twice during any twelve-month period. In May 2011, Dallman defaulted on Advance F. Upon his default, Felt & Lukes began calling Dallman and sending him letters requesting payment. On June 20, 2011, Felt & Lukes prepared a Notice of Right to Cure Default on Advance F and sent it via certified and U.S. mail. The Notice identified Advance F as the loan in default; described the collateral as the "2003 Ford"; and informed Dallman that he could cure the default by paying $676.55 by July 5, 2011. When Dallman cured that default, neither Felt & Lukes nor PCCU took any further action to repossess the collateral.

Sometime in July 2011, Dallman defaulted on Advance E. The total amount he still owed on Advance E exceeded the value of either the F250 or the F350 individually. Once again, Felt & Lukes began calling Dallman and sending him a variety of letters asking for payment. On July 5, 2011, Felt & Lukes mailed Dallman two envelopes, one by certified mail and one by U.S. mail. Dallman never received the certified mail envelope, which was returned to Felt & Lukes on August 1, 2011, unclaimed and unable to be forwarded, according to the imprint on the envelope.[4] When it was returned, a mail sticker obscured Dallman's address. Sharon Riley, a Felt & Lukes employee, does not recall receiving the certified mail envelope, but a notation on the envelope indicates she handled it. She does not recall whether she opened it, but she admits she may have. At any rate, Lynn Lukes

---

[4] Dallman testified that he did receive the U.S. mail envelope; he contends that the U.S. mail envelope contained *only* a Notice of Right to Cure Default for the F250. He has not produced the U.S. mail envelope or Notice F250 in this litigation.

testified that the envelope was open by the time she retrieved it, sometime after October 2011.

The parties dispute what exactly was contained within the certified mail envelope. They agree, however, that the certified mail envelope contained at least one Notice of Right to Cure Default stating that Dallman was in default on a note dated January 11, 2011 in the amount of $40,561.50 (that is, Advance E) and describing the collateral as a "2003 Ford F250." This "Notice F250" also contained the name and address of PCCU, the loan account number and Lukes' phone number; a statement that, as a result of Dallman's default, the merchant may have the right to take possession of the collateral without further notice or court proceeding; a statement that if the customer is not in default or objects to the merchant's right to take possession of the collateral, he must notify the credit union in writing within fifteen days of the Notice;[5] and a statement that the customer may be required to pay court costs and attorney fees in the event of a court proceeding to collect.

---

[5] The parties appear to dispute whether this provision meets the notice requirements of Wis. Stat. § 425.205(1g)(a)3, which states that the notice shall contain "[a] statement that if the customer is not in default or objects to the merchant's right to take possession of the collateral or goods, the customer may, no later than 15 days after the merchant has given the notice, *demand that the merchant proceed in court* by notifying the merchant in writing." (Emphasis added.) The court agrees with defendants, however, that Dallman did not plead enough facts to put them on notice of this potential claim for relief. The Amended Complaint states:

> Upon information and belief, Defendants failed to provide proper statutory notice prior to repossessing the Second Vehicle pursuant to § 425.205, Stats. Specifically, Defendants failed to provide Mr. Dallman with any Notice of Right to Cure Default for the First Vehicle, which included his Second Vehicle as collateral available for repossession.

5

At some point, a second Notice of Right to Cure Default was generated for Dallman's F350. This "Notice F350" stated that Dallman was also in default on the note dated Jan. 11, 2011 in the amount of $14,472.32, for failure to make payments due on Advance E and described the collateral as "2003 Ford F350 cross collateralized." Dallman claims that the Notice F350 was *not* contained within the U.S. mail envelope and that he, therefore, never received it. The parties vigorously dispute whether the Notice F350 was placed in the certified mail envelope along with the Notice F250.

Dallman never cured his default on Advance E, notified PCCU that he was not in default on Advance E, or objected in writing to PCCU repossessing the trucks collateralizing Advance E without a court proceeding. On October 27 or 28, 2011, Dallman contacted Felt & Lukes about voluntarily surrendering the F250. Felt & Lukes hired a repossession agent in light of the default. On October 28th, Dallman voluntarily surrendered the F250 and the agent repossessed the F350.

In this suit, Dallman alleges that defendants failed to send him the Notice F350, which under the WCA is required before taking possession of motor vehicle collateral. *See* Wis. Stat. § 425.205(1g)(a). Though notice is presumed upon mailing by certified or registered mail, *see* Wis. Stat. § 425.205(1g)(c), he alleges that there is a genuine dispute of material fact as to whether defendants *actually* included the Notice F350 in the certified mail envelope. Defendants argue that (1) neither the FDCPA nor the WCA applies in this

---

(Amended Compl. (dkt. #12) ¶ 48; *see also id*. at ¶ 23.) Dallman pleads no other facts suggesting that the Notice F250 was not in compliance with Wisconsin statutes. Accordingly, he has failed to state any other claim for deficient notice under that section.

6

case and (2) in the alternative, they are entitled to summary judgment because there is no genuine dispute as to whether Felt & Lukes sent the Notice F350 via certified mail.

## OPINION

**I. Legal Standard**

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Id.* at 323.

II. Applicability of FDCPA

As a preliminary matter, the court must determine whether the FDCPA applies to this case, since its jurisdiction is premised on a federal question arising from that section. The parties apparently do not dispute that Felt & Lukes is generally a "debt collector" as defined in 15 U.S.C. § 1692a(6). (*See* Defs.' Reply (dkt. #60) 11.) Neither do they dispute that PCCU retained Felt & Lukes in order to collect the funds that Dallman owed on his loans, nor that Felt & Lukes "took steps" to get Dallman to make payments on his account. (Resp. PPFOF (dkt. #61) ¶¶ 19-20.) Rather, defendants argue that the court must distinguish between its *general* debt collection activities and the *specific* action it took to cause the repossession of the F350 here. According to defendants, the latter is merely the enforcement of a security interest, rather than a debt collection activity, which falls outside the scope of the FDCPA.

Defendants are correct that courts generally distinguish between debt collection and the enforcement of security interests, because the latter is not regulated by the FDCPA. *See, e.g.*, *Jordan v. Kent Recovery Servs., Inc.*, 731 F. Supp. 652, 656-59 (D. Del. 1990) (interpreting FDCPA to exclude repossessors from definition of "debt collector"); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 924 (N.D. Ind. 2004) ("Security enforcement activities fall outside the scope of the FDCPA because they aren't debt collection practices."). There is, however, an exception to this general rule. The section of the FDCPA that defines "debt collector" states that "[f]or the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests." 15 U.S.C. § 1692a(6). Even the cases upon which defendants rely recognize this exception.

*See Nadalin v. Auto. Recovery Bureau*, 169 F.3d 1084, 1085 (7th Cir. 1999) ("The [FDCPA] regulates the practices of 'debt collectors,' a term that is defined as excluding repossessors and other enforcers of security interests, 15 U.S.C. § 1692a(6), except that a repossessor may not take or threaten to take nonjudicial action to dispossess a person of property if 'there is no present right to possession of the property claimed as collateral through an enforceable security interest.' § 1692f(6)(A)."); *Rosado*, 324 F. Supp. at 924 n.3 (noting that "§ 1692f(6) applies to security enforcement actions"); *Overton v. Foutty & Foutty, LLP*, No. 1:07-cv-0274-DFH-TAB, 2007 WL 2413026, at *4 (S.D. Ind. Aug. 21, 2007) (recognizing the "specific provision applying § 1692f(6) to enforcers of security interests").

Section 1692f(6) states in relevant part that a debt collector may not take any nonjudicial action to effect dispossession of property if "there is no present right to possession of the property claimed as collateral through an enforceable security interest." 15 U.S.C. § 1692f(6)(A). Here, Dallman alleges exactly that: defendants did not send him the notice that state law mandated be sent before they could repossess his motor vehicle collateral. Consequently, he alleges, they took the F350 without having a "present right to possession." Dallman's FDCPA claim thus arises under § 1692f(6) and falls squarely within the exception to the general rule excluding security interest enforcement from the FDCPA. Accordingly, the court need not resolve the question of whether the repossession constituted debt collection or security interest enforcement. Either way, the FDCPA would apply.

### III. Applicability of WCA

Defendants also argue that the *WCA* does not apply in this case. Specifically, they point to § 421.202, which lists transactions that are statutorily excluded from the scope of

the WCA. Under that section, "[c]hapters 421 to 427 do not apply to any of the following: . . . (6) Consumer credit transactions in which the amount financed exceeds $25,000[.]" Wis. Stat. § 421.202(6). First, defendants argue that Advances E and F were part of the same consumer credit transaction, and the "amount financed" was, therefore, $55,033.82, more than double the statutory cut-off of the WCA. In the alternative, defendants point out that even if the court finds that Advances E and F are separate transactions, Advance E exceeded $40,000 by itself and still falls outside of the scope of the WCA's coverage. And because the F350 was repossessed in connection with Dallman's default on Advance E, he was not entitled to notice under the WCA.

Dallman makes several arguments in response. While admitting that the WCA applies only to transactions where the amount financed is less than $25,000, Dallman argues that: (1) each advance is a separate transaction for the purposes of the WCA, such that Advance F does not exceed the statutory cap; (2) defendants "opted in" to the WCA for Advance E; and (3) even if the court finds Advance E is exempt from the WCA, defendants were required to comply with the WCA before repossessing the F350, because the F350 was cross-collateralized pursuant to Advance F, which *is* subject to the WCA.

The broader question of whether the two advances constituted a single transaction or multiple transactions for purposes of the WCA "is a mixed question of fact and law." *Dorr v. Sacred Heart Hosp.*, 228 Wis. 2d 425, 448, 597 N.W.2d 462 (Ct. App. 1999). Once the facts surrounding those advances are established, the court can then determine whether, as a matter of law, the advances fulfill the legal standard for a single transaction or separate transactions. *Dorr,* 228 Wis. 2d at 449.

The parties set forth a variety of different facts they contend support their respective positions. Dallman points out that Advances E and F were for different sums of money; they had different monthly payments and APRs; all payments he made were applied to the specific loan for which they were intended; and finance charges were computed separately for each separate balance under the plan. Defendants do not dispute any of these facts. (*See* Resp. to PPFOF (dkt. #61) ¶¶ 37-38, 44-46, 55-56, 61-63.) Instead, they argue that the two advances represent a single transaction made pursuant to the Plan. In support, they point out that Dallman signed only one Security Agreement; each sum advanced was governed by the Security Agreement's overarching terms; and any collateral securing individual advances also secured all other advances under the Loanliner Plan. All of these facts plaintiff, in turn, does not dispute. (Reply to DPFOF (dkt. #62) ¶¶ 10-16.)

With the facts established, the court turns to the correct legal standard. Under the WCA, a "transaction" is "an agreement between 2 or more persons, whether or not the agreement is a contract enforceable by action, and includes the making of and the performance pursuant to that agreement."[6] Wis. Stat. § 421.301(44). A "consumer credit transaction," specifically, is defined as:

> [A] consumer transaction between a merchant and a customer in which real or personal property, services or money is acquired on credit and the customer's obligation is payable in installments or for which credit a finance charge is or may be imposed, whether such transaction is pursuant to an open-end credit plan or is a transaction involving other than open-end credit. The term includes consumer credit sales, consumer loans, consumer leases and transactions pursuant to open-end credit plans.

---

[6] An "agreement" is "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." Wis. Stat. § 421.301(3).

11

Wis. Stat. § 421.301(10).

Applying the undisputed facts to this legal standard, the court agrees with Dallman that the two advances at issue are separate "consumer credit transactions." First, the Security Agreement does not meet the definition of a "consumer credit transaction." By signing the Security Agreement, Dallman neither acquired property, services or money on credit, nor did he undertake an obligation to pay back money in installments or pay a finance charge. Rather, signing the Security Agreement represented the beginning of his participation in an open-ended credit plan, which permitted him to borrow money "from time to time" -- that is, permitted him to enter into "consumer credit transactions" in the *future*. (*See* Petrillo Affidavit Exh. B (dkt. #22-2).) To the extent that defendants contend the Agreement represents a single "consumer credit transaction," that argument appears inconsistent with the statutory text, as well as the parties' agreement and course of credit.

The court also finds that each advance separately meets the legal standard to qualify as a "consumer credit transaction." As previously noted, the WCA defines a "transaction" as an "agreement, which in turn is defined as a "bargain" between the parties. Based on the undisputed facts, the two advances represented different "bargains" between Dallman and PCCU. Advance E was for $40,561.50, with an APR of 8.5% and a monthly payment obligation of $756.33 for purchase of the F250. (Resp. to PPFOF (dkt. #61) ¶¶ 37-38, 40.) Advance F was for $14,472.32, with an APR of 8.0% and a monthly payment obligation of $353.34, for purchase of the F350. (*Id.* at ¶¶ 44-46, 49-50.) The payments were due on different dates. (*Id.* at ¶¶ 64-65.) Each payment was applied to the specific loan for which it was intended. (*Id.* at ¶ 61.) Lastly, the applications for each advance show that Advance E was disclosed as an outstanding liability when Dallman applied for Advance F, and vice

12

versa. (*See* Petrillo Affidavit Exhs. C & D (dkt. ##22-3, 22-4).) These facts belie defendants' argument that "the total amount financed was treated as a single advance." (Def.'s Summ. J. Br. (dkt. #25) 12.) On the contrary, each advance represented a separate bargain, were subject to its own terms, and were separate transactions as a matter of law.[7]

Therefore, the WCA indisputably applies to Advance F, a loan made in the amount of $14,472.32. Advance E, however, was made in the amount of $40,561.50, far in excess of the $25,000 statutory cut-off, which falls outside the scope of the WCA.

To overcome this obstacle, Dallman first argues that defendants have "opted in" to the WCA with respect to Advance E, such that they were required to comply with all of its provisions in spite of the statutory exclusion. He cites *Bank of Barron v. Gieseke*, 169 Wis. 2d 437, 485 N.W.2d 426 (Ct. App. 1992), for the proposition that a lender may opt into the WCA for consumer credit transactions in an amount greater than $25,000. In *Bank of Barron*, the Wisconsin Court of Appeals interpreted a consumer real estate security agreement (CRESA), which provided that the lender had a continuing lien on the property to secure any debts arising out of "credit granted in the future by Lender to any Customer … except credit in an original amount of less than $1,000.00, the granting of which is subject to the Wisconsin Consumer Act." *Id.* at 453. The Bank, in seeking priority for certain notes, argued that the final clause ("the granting clause") allowed it to "opt in" to the WCA for *all* future credit advances, regardless of whether the amount exceeded $25,000. The Wisconsin Court of Appeals agreed, determining that the granting clause modified future

---

[7] The court finds additional support for its conclusion in the fact that the definition of "consumer credit transaction" contemplates that an open-ended credit plan may give rise to separate transactions, rather than the plan itself representing a single transaction for all future sums advanced. *See* Wis. Stat. § 421.301(10).

credit and that "[t]here is nothing in the WCA, specifically ch. 422, Stats., governing consumer credit transactions, that would prevent a lender from opting in to the WVA for consumer credit granted in an amount greater than $25,000." *Id.* at 456. "If the lender opts in, it has to meet the requirements of the WCA." *Id.*

Having determined that lenders *could* opt into the WCA, and that the granting clause gave the parties that option, the court went on to hold that the $104,611.07 note at issue was *not* subject to the WCA, because it included a clause that read the note was "not governed by the Wisconsin Consumer Act." Thus, although the parties had the option to opt into the WCA, the court found that they had not exercised that option with respect to the note at issue. *Id.* at 458-59.

Dallman argues that the Security Agreement incorporates WCA protections and that the PCCU has, therefore, "opted in" to the WCA for any advances over $25,000. Specifically, Dallman points to the following passage in Paragraph 13 of the Security Agreement:

> ***The following paragraph applies only to Wisconsin borrowers:*** When you are in default and *after expiration of any right you have under applicable state law to cure your default*, we may require immediate payment of your outstanding loan balance under the Plan and seek possession of property given as security. You may voluntarily give the property to us if you choose, or we may seek to take possession of the property by judicial process. If we repossess the property, you agree to pay reasonable expenses incurred in disposing of the property. If the property is a motor vehicle, mobile home, trailer, snowmobile, boat or aircraft, you will also be required to pay any costs permitted by Section 422.413 of the Wisconsin Statutes.

(Petrillo Aff. Exh. B (dkt. #22-2) ¶ 13 (emphasis added).) The Security Agreement also refers to other provisions of the WCA: for instance, it provides that PCCU "can change the

terms of the Plan from time to time in accordance with Section 422.415 of the Wisconsin Statutes" and that a borrower's obligation to pay unpaid balances continues after cancellation "except to the extent that [his] liability is limited by Section 422.4155 of the Wisconsin Statutes." (Petrillo Aff. Exh. B (dkt. #22-2) ¶ 14.) Dallman argues that based on these references, and on the fact that the Security Agreement does not state that the WMC does *not* apply, a consumer would reasonably have assumed he was guaranteed the protections of the WCA in all respects, and the court should accordingly enforce that agreement.

While defendants concede that *Bank of Barron* supports enforcement of an *express* opt-in requiring the WCA to apply, they point out that the CRESA in that case contained just that: an explicit provision stating that future credit advances were "subject to the Wisconsin Consumer Act." In contrast, here, the Security Agreement merely makes reference to certain provisions of the WCA, but nothing in the Security Agreement indicates that those provisions would apply even if a future advance exceeded the $25,000 statutory limit.

This is a close question, made more difficult by the fact that it does not appear any court has considered the opt-in question since *Bank of Barron*. Furthermore, the *Bank of Barron* court provided little guidance as to what constitutes an express "opt in," since the language in the note at issue was unambiguous in *declining* to opt in. Ultimately, *Bank of Barron* suggests that the focus should be on "the parties' true intentions as expressed by the contractual language." *Bank of Barron*, 169 Wis. 2d at 455.

With that guiding principle in mind, the court finds nothing in the documents indicating that PCCU opted in to the WCA -- and all the duties and potential liabilities that

follow -- with regard to Advance E.  The general statement of Paragraph 13 on which Dallman relies states only that PCCU may require immediate payment of an outstanding balance "after expiration of any right you have under *applicable* state law." Petrillo Aff. Exh. B (dkt. #22-2) ¶ 13 (emphasis added).)  Since the WCA is *not* applicable to Advance E based on the exclusion of section 421.202(6), this provision does not help Dallman.  While the remaining references to particular sections of the WCA in the Agreement may suggest PCCU agreement to abide by *some* of the protections of the WCA, none of the statutory sections the Agreement references have anything to do with the notice requirement of section 425.205(1g)(a).  Ultimately, the Agreement evinces no intent on PCCU's part to opt into the WCA for transactions that by their terms are otherwise excluded from its scope.

Dallman also argues that defendants opted into the WCA by sending either the first notice of default on Advance F, which he admits receiving in June 2011, or the Notice F250, which he received via regular mail when he defaulted on Advance E.  Both those notices read at the top that they are "[r]equired before legal action for collection is commenced.  Wisconsin Statutes 425.105." (Lukes Affidavit Exhs. A & B (dkt. ##21-1, 21-2); *see also* Resp. to PPFOF (dkt. #61) ¶¶ 83, 135.)  While Felt & Lukes may have muddied the waters by sending the notices when it was not required to do so, Felt & Lukes did not agree to take on the legal responsibility of complying with the WCA in its entirety simply by providing notice above and beyond what was required.  The notices appear to be standardized, created using the same form and language regardless of the amount at issue -- and thus regardless of whether the WCA actually applies. (*Compare* dkt. #21-1 (default on Advance F), with dkt. #21-2 (default on Advance E).)  Such a boilerplate notice, with no language expressing an intent to opt into the WCA (and indeed, with no language even

16

clearly demonstrating that opting in was an option the parties contemplated), cannot serve to bind defendants to all the responsibilities and potential liabilities such a decision would entail.

Finally, Dallman argues that, even if Advance E is exempt from the WCA, defendants needed to comply with it for purposes of repossessing the F350 because *that* truck was purchased with and secured Advance F, which *is* subject to the WCA. Thus, he contends that a reasonable consumer would expect that the F350, as collateral initially securitized by a covered transaction, would be protected by the WCA. Defendants cite no case law for this proposition, nor did the court find any support for this argument in the WCA itself. The WCA does not offer protection or withhold it based on the *collateral* at issue. The focus is on the *transaction:* section 421.202(6) states that the WCA does not apply to any "[c]onsumer credit *transactions* in which the amount financed exceeds $25,000." The consumer credit *transaction* at issue here -- and the one for which Dallman contends he deserved the protections of the WCA -- was Advance E. Advance E indisputably exceeds the $25,000 cap. The mere fact that the F350 *also* collateralized Advance F, which *was* subject to the WCA, is therefore essentially irrelevant.[8]

---

[8] An additional wrinkle comes from the Notice F350 and from the deposition testimony of Lynn Lukes. The Notice F350 states that Dallman is in default on a Note "dated 1/11/2011 in the original amount of $14,472.32." Given the amount, this obviously refers to Advance F, not Advance E. In fact, the parties apparently do not dispute that "[a]lthough Mr. Dallman [w]as not behind in his payments on Loan F, Felt & Lukes considered him in default on Loan F for failing to make payments on Loan E." (Resp. to PPFOF (dkt. #61) ¶ 120.) Ultimately, though, it is clear that the F350 was repossessed in connection with Dallman's non-payment on Advance E, to cover a balance that the parties agree was greater than the worth of either one of the two trucks. (Reply to DPFOF (dkt. #62) ¶ 35.) Dallman failed to fulfill his obligations under Advance E and as a result opened up the cross-collateralized F350 to repossession. Even though the parties ostensibly agree that Felt & Lukes "considered" Dallman to have defaulted on Loan F, there are *no* facts in

Because the court finds that the WCA does not apply to Advance E, it need not reach the issue of whether there is a genuine dispute of material fact as to whether Felt & Lukes sent the Notice F350 via certified mail. Since no such notice was required, defendants are, therefore, entitled to summary judgment on plaintiff's WCA claims.

**IV. Other Claims**

Dallman's other claims will be dismissed from this case as well, because those claims are also premised on a violation of the WCA. Beyond the lack of adequate notice under the WCA, Dallman offers no other reason why defendants were not entitled to take the F350. Indeed, he admits that (1) the F350 secured repayment on Advance E (Reply to DPFOF (dkt. #62) ¶ 25); and (2) he defaulted on Advance E and did not cure the default. (*Id.* at ¶¶ 34, 52) His civil theft and conversion claims, therefore, fail as a matter of law, because defendants indisputably had the right to take possession of the F350 pursuant to their security interest in the vehicle.

The FDCPA claims, too, are premised on a violation of the WCA. Dallman essentially alleges that defendants had no present right to repossess the F350 at the time that they took it.[9] *See* 15 U.S.C. § 1692f(6). "A court should look to state law

---

the record suggesting that he actually did. Neither party contends that Dallman had missed payments on Advance F, nor that he had breached some other term of the agreement with regard to Advance F that materially impaired his ability to pay the amount he owed or the condition, value or protection of or defendants' right in property he gave as security. (*See* Petrillo Affidavit Exh. B (dkt. #22-2) ¶ 12 (defining "default" under the Agreement).) While the provisions of the WCA are to be construed and applied liberally, the court will not ignore the reality that the F350 was repossessed due to Dallman's default on Advance E, which is exempt from the WCA.

[9] The Amended Complaint also names 15 U.S.C. § 1692e as a section that defendants have violated, but Dallman offers no facts that suggest that defendants used a "false, deceptive, or misleading representation or means in connection with the collection" of the debt at

requirements to determine whether there was a present right to possession under the FDCPA." *Speleos v. BAC Home Loans Serv., L.P.*, 824 F. Supp. 2d 226, 233 (D. Mass. 2011) (quoting *Revering v. Norwest Bank Minn., N.A.,* No. Civ. 99-480/RHK/JMM, 1999 WL 33911360, at *5 (D. Minn. Nov. 30, 1999)). Since the court has already determined that the WCA did not apply to Advance E, the lack of notice to cure default did not undermine the right defendants otherwise had to take the car. Dallman has suggested no other reason why defendants did not have a right to repossess the F350 under state law at the time of repossession, and so the court will grant summary judgment to defendant on these claims as well.

ORDER

IT IS ORDERED that defendants' Motion for Summary Judgment (dkt. #18) is GRANTED.

Entered this 17th day of December, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

issue.